**Daniel COWIN, Appellant,**

v.

**Charles S. BRESLER, et al.**

**No. 83–1597.**

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 17, 1984.

Decided Aug. 7, 1984.

Jerome M. Congress, New York City, with whom Herbert E. Milstein, Washington, D.C., was on the brief, for appellant.

Theodore R. Mann, S. Mark Werner, Philadelphia, Pa., with whom Judah Best and Howard Stahl, Washington, D.C., were on the brief, for appellees.

Before WRIGHT, WILKEY and BORK, Circuit Judges.

BORK, Circuit Judge:

Bresler & Reiner, Inc. is a publicly-owned company incorporated in the State of Delaware and engaged in the development and management of residential and commercial properties in the District of Columbia. In late 1980, Daniel Cowin, a Bresler & Reiner shareholder, sued the company and its directors on his own behalf. Cowin has a minority interest in the company. The individual directors-appellees, with their families, own in excess of 79% of the company's stock. Appellees Bresler and Reiner together hold more than 70% of the company's outstanding shares, and their control of the corporation is undisputed.

The thrust of Cowin's charges is that the appellees have manipulated the business for their personal profit at the expense of the minority shareholders. The complaint alleges numerous instances of corporate mismanagement, fraud, and self-dealing, all in breach of the common law fiduciary duty owed by the directors of the company to the appellant as a shareholder. Several of the challenged transactions involve deals between the company and certain limited partnerships in which the appellees, including Bresler and Reiner, have significant interests. The complaint also charges Bresler and Reiner with forcing the company to engage in a stock repurchase program at a time when the company was in default on its notes payable and having severe cash flow problems. Cowin alleges that appellees used, and are still using, the repurchase plan to "severely limit[ ] the public market for trading in Company stock"; according to appellant, their ultimate intent is to "covert[ ] the Company to a private corporation owned solely by" them for their own benefit. Brief for Plaintiff-Appellant at 14. To remedy the alleged common law violations, Cowin seeks damages for the diminished value of his stock and injunctions against the allegedly wrongful transactions. He also requests the appointment of a receiver to liquidate the company for his benefit and the benefit of the other shareholders.

The remainder of the complaint charges appellees with violations of the federal securities laws, primarily in connection with the transactions detailed above. Specifically, Cowin claims that Bresler and Reiner caused the company to "disseminate reports to the public shareholders which were materially deceptive" and concealed material information in violation of Rule 10b–5 and section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1982). Brief for Plaintiff-Appellant at 15. The complaint also charges appellees with violating section 14(a) of the 1934 Act, 15 U.S.C. § 78n(a) (1982), by causing the company to issue deceptive proxy materials. Cowin seeks to require the disclosure of

the material concealed in alleged violation of the Act and, among other things, to invalidate the elections for directors based on the alleged proxy violations.

Appellees moved promptly to dismiss the complaint. They also sought, and received from the district court, an order barring all discovery pending disposition of the motion to dismiss. As a result, no discovery was permitted during the proceedings below.

In its first order, entered December 23, 1981, the district court ruled that while Cowin could legally seek the appointment of a receiver for a solvent corporation in his individual capacity, he had failed to allege the "extreme circumstances showing imminent danger of great loss" necessary to support such drastic relief. *Cowin v. Bresler*, No. 80–2230, mem. op. at 3 (D.D.C. Dec. 23, 1981); Record Excerpts ("R.E.") at 32. The court then dismissed appellant's common law claims because, in its view, both federal and common law required Cowin to "bring ... a derivative suit to recover damages for a decline in the value of stock" due to alleged corporate mismanagement and fraud. *Id.* at 35. The court would "not permit [Cowin] to elevate form over substance in order to escape the requirements of a derivative suit merely by attaching an unjustified request for the appointment of a receiver ... to his complaint." *Id.* at 36.

The district court also dismissed most of appellant's Rule 10b–5 claims.[1] Relying on *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), the court held that the "reincorporation [into federal securities law claims] of [Cowin's] common-law claims for breaches of fiduciary duties as well as the alleged 'nondisclosures' ... must be dismissed as unsuccessful attempts to create a 10b–5 cause of action out of claims of corporate mismanagement." R.E. at 40. Certain other alleged securities law violations were dismissed for lack of specificity under Fed. R.Civ.P. 9(b). R.E. at 40 n. *, 42–43. The court did not dismiss Cowin's section 14(a) proxy disclosure claims, however, nor did it dismiss that portion of appellant's Rule 10b–5 claims that did not "integrally relate[ ] to [the] allegations of the nondisclosure of certain breaches of fiduciary duty." R.E. at 44–45.

Appellees answered those portions of the complaint that survived the lower court's order and moved for summary judgment on the section 14(a) claim. In its second order, entered April 21, 1983, the district court granted summary judgment for appellees on that claim, holding that Cowin had no standing to challenge, on an individual basis, the allegedly misleading nature of proxy solicitations because he had not personally relied on them.[2]

This appeal followed.[3]

1. The court held that Cowin had standing to raise these claims. On appeal, appellees renew the argument that Cowin had no standing to sue under § 10(b) because he was neither a purchaser nor seller who had acted in reliance on the company's alleged misrepresentations. *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 731–32, 737–38, 95 S.Ct. 1917, 1923–24, 1926–27, 44 L.Ed.2d 539 (1975); Brief for Appellees at 32–36. Cowin's (and the district court's) position, on the other hand, is that the *Blue Chip* standing requirements are relaxed when a complainant seeks equitable relief and not damages. R.E. at 37–38.

2. The court ruled, alternatively, that Cowin could not demonstrate "loss causation" or economic injury and that the equitable relief appellant sought on his § 14(a) claim—the invalidation of the 1980 directors' election—would "constitute an exercise of futility" because of appellees' unquestionable control over a significant majority of votes. R.E. at 53 (citing *Schlick v. Penn-Dixie Cement Corp.*, 507 F.2d 374, 380 (2d Cir.1974), *cert. denied*, 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975)).

With respect to that portion of Cowin's § 10(b) claim that survived the motion to dismiss, the lower court dismissed "without prejudice ... to facilitate an expeditious appeal of this action." R.E. at 55. The court based this action on what it deemed the expectations of both parties.

3. The district court dismissed most of Cowin's complaint under Fed.R.Civ.P. 12(b)(6) for failure to state a claim for which relief could be granted. The standards by which we judge the propriety of that dismissal are well-established. We must liberally construe the complaint "with all factual allegations deemed to be true and with doubts resolved in favor of the pleader." *Shear v. National Rifle Ass'n of America*, 606

**414**

## I.

### A.

We agree with the district court's holding that appellant's common law claims for damages and injunctive relief must be pursued, if at all, on a derivative basis.[4] Both case law and sound policy support this conclusion. In *Bokat v. Getty Oil Co.*, 262 A.2d 246, 249 (Del.1970), plaintiff shareholder charged that Getty Oil had, among other things, forced its wholly-owned subsidiary to purchase oil from Getty at an inflated price. Delaware's highest court characterized this claim as one "seek[ing] money damages for improper management" and held that such claims belonged to the corporation and not to its minority stockholders:

> When an injury to corporate stock *falls equally upon all stockholders*, then an individual stockholder may not recover for the injury to his stock alone, but must seek recovery derivatively in behalf of the corporation.

*Id.* at 249 (emphasis added). The court concluded that "[m]ismanagement which depresses the value of stock is a wrong to the corporation; i.e., the stockholders collectively, to be enforced by a derivative action." *Id.* See also *Crane Co. v. Harsco Corp.*, 511 F.Supp. 294, 304 (D.Del.1981);

*Elster v. American Airlines, Inc.*, 34 Del.Ch. 94, 98–99, 100 A.2d 219, 222 (1953).[5]

■ The logic of *Bokat* is compelling. Claims of corporate mismanagement must be brought on a derivative basis because no shareholder suffers a harm independent of that visited upon the corporation and the other shareholders. Because each shareholder has been injured in proportion to his equity ownership, "each will be made whole if the corporation obtains compensation or restitution from the wrongdoer." *Empire Life Insurance Co. v. Valdak Corp.*, 468 F.2d 330, 335 (5th Cir.1972). A contrary rule "would authorize multitudinous litigation and ignore the corporate entity." *Sutter v. General Petroleum Corp.*, 28 Cal.2d 525, 530, 170 P.2d 898, 901 (1946). See also *Brooks v. Land Drilling Co.*, 564 F.Supp. 1518, 1521 (D.Colo.1983); 13 W. Fletcher, *Cyclopedia on the Law of Corporations* § 5911 (Perm. ed. 1980). Requiring derivative enforcement of claims belonging in the first instance to the corporation also prevents an individual shareholder from incurring a benefit at the expense of other shareholders similarly situated. *See* 13 W. Fletcher, *supra*, § 5915, at 323.

■ This general rule is the law of several jurisdictions.[6] There are, however,

F.2d 1251, 1253 (D.C.Cir.1979) (citation omitted). Dismissal is not appropriate "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claims which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957); *Schuler v. United States*, 617 F.2d 605, 608 (D.C.Cir.1979). To affirm, we must find beyond doubt that there is no set of facts favorable to Cowin and suggested by his complaint upon which the district could grant any form of relief. *See Gray v. Bell*, 712 F.2d 490, 493 n. 2 (D.C.Cir.1983), *cert. denied*, — U.S. —, 104 S.Ct. 1593, 80 L.Ed.2d 125 (1984).

**4.** Because Bresler & Reiner is incorporated in Delaware, the substantive law of that state governs our disposition of Cowin's common law claims of corporate mismanagement, fraud, and self-dealing. *See Weiss v. Kay Jewelry Stores, Inc.*, 470 F.2d 1259, 1268 (D.C.Cir.1972).

**5.** Courts applying Delaware law are unanimous on this question. *See Cole v. Ford Motor Co.*, 566 F.Supp. 558, 568–69 (W.D.Pa.1983) (apply-

ing Delaware law); *Downey v. Vernitron Corp.*, 559 F.Supp. 1081, 1086 (D.Mass.1982) (same); *Reeves v. Transport Data Communications, Inc.*, 318 A.2d 147, 149–50 (Del.Ch.1974); *Harff v. Kerkorian*, 324 A.2d 215, 218 (Del.Ch.1974), *aff'd in part, rev'd in part*, 347 A.2d 133 (Del.1975). *Cf. Lewis v. Knutson*, 699 F.2d 230, 237–38 (5th Cir.1983) (applying Delaware law). The *Bokat* rule also applies to actions seeking injunctive relief. *See Crane Co.*, 511 F.Supp. at 304; *Elster*, 100 A.2d at 222.

**6.** *See, e.g., Lewis v. Chiles*, 719 F.2d 1044, 1049 (9th Cir.1983); *Stevens v. Lowder*, 643 F.2d 1078, 1080 (5th Cir.1981); *Lewis v. S.L. & E., Inc.*, 629 F.2d 764, 768 n. 10 (2d Cir.1980); *Brown v. Presbyterian Ministers Fund*, 484 F.2d 998, 1005 (3d Cir.1973); *First Hawaiian Bank v. Alexander*, 558 F.Supp. 1128, 1133 (D.Hawaii 1983); *Goodman v. DeAzoulay*, 554 F.Supp. 1029, 1038–39 (E.D.Pa.1983); *EMI Ltd. v. Bennett*, 560 F.Supp. 134, 135 (N.D.Cal.1982); *Willis v. Dillsburg Grain & Milling Co.*, 490 F.Supp. 46, 49 (M.D.Pa.1980); *Press v. Marvalan Industries,*

certain circumstances in which a shareholder may proceed against his company on an individual basis. In *Elster v. American Airlines, Inc.*, the Delaware chancery court stated:

> There are cases, of course, in which there is injury to the corporation and also *special injury* to the individual stockholder. In such cases a stockholder, if he should so desire, may proceed on his claim for the protection of his individual rights rather than in the right of the corporation. The action would then not constitute a derivative action.

34 Del.Ch. at 99, 100 A.2d at 222 (emphasis added).

A fair reading of the "special injury" cases shows that a personal cause of action is properly pursued in two situations—where the allegedly wrongful conduct violates a duty to the complaining shareholder independent of the fiduciary duties owed that party along with all other shareholders, or, where the conduct causes an injury to the shareholders distinct from any injury to the corporation itself. In cases of the first sort, the complaining shareholder may sue as an individual only because he stands, and has been injured in his relationship to the corporation, in a capacity other than that of a shareholder. In *Sedco International, S.A. v. Cory*, 522 F.Supp. 254 (S.D. Iowa 1981), *aff'd*, 683 F.2d 1201 (8th Cir.), *cert. denied*, 459 U.S. 1017, 103 S.Ct. 379, 74 L.Ed.2d 512 (1982), for example, a shareholder was permitted to bring a personal action against the company because he was injured in his capacity as a creditor of the corporation; his status as a shareholder was irrelevant to his right to pursue a creditor's remedy. The court found that the "right to recovery asserted is entirely independent of Carver's status as a shareholder" and held that "his dual capacity— as creditor and shareholder—[did not] operate[ ] to cut off his rights as a creditor and vest them in the corporation itself." 522 F.Supp. at 314. *Empire Life* is to a similar effect. The Fifth Circuit recognized the

"established rule that if a plaintiff sues in a stockholder capacity for corporate mismanagement, he must bring the suit derivatively in the name of the corporation." 468 F.2d at 335. In that case, however, the counterclaiming defendant had alleged not only that the plaintiff had violated fiduciary duties owed defendant as a shareholder but also that the plaintiff had violated an independent duty—as pledgee in a loan transaction with the defendant—not to deplete the value of the collateral intentionally. *Id.* In these circumstances, the court stated:

> [T]he defendant seeks damages as a *pledgor*. The fact that his pledge is stock and that if the manipulated depreciation of the stock is proven would also give rise to a derivative suit by defendant as *stockholder* should not foreclose the suit as pledgor. The role of pledgor and stockholder are not identical and defendant may play the part he chooses.... We find that defendant ... is entitled to bring his claim as individual pledgor.

*Id.* at 336 (emphasis in original). *See also Schaffer v. Universal Rundle Corp.*, 397 F.2d 893, 896 (5th Cir.1968); 13 W. Fletcher, *supra*, at § 5921.

The second category of harms which may be remedied on an individual basis consists of "wrong[s] inflicted upon [the stockholder] alone ... or wrong[s] affecting ... the stockholders and not the corporation...." *Elster*, 34 Del.Ch. at 99, 100 A.2d at 222. Wrongful withholding of dividends, for example, gives rise to an individual cause of action. *See Abelow v. Symonds*, 38 Del.Ch. 572, 578, 156 A.2d 416, 419 (1959). Because dividends are an incident of stock ownership, an action to compel the payment of dividends withheld will not inure to the benefit of the corporation; the shareholders alone will gain by a judgment in their favor and, therefore, each shareholder may sue for his own account. *See Knapp v. Bankers Securities*

---

*Inc.*, 468 F.Supp. 1072, 1078 (S.D.N.Y.1979); *Johnson v. American Gen. Ins. Co.*, 296 F.Supp.

802, 810 (D.D.C.1969). *See generally* 13 W. Fletcher, *supra*, at §§ 5911, 5924.

*Corp.*, 230 F.2d 717 (3d Cir.1956); *see also Crane Co.*, 511 F.Supp. at 304.

*Condec Corp. v. Lunkenheimer Co.*, 43 Del.Ch. 353, 230 A.2d 769 (1967), is also representative of this second category. In that case, the company's directors denied a controlling corporate shareholder its right to exercise voting control over the company. This claim was properly remedied on an individual basis because the injury was the shareholder's alone, not shared by the corporation or other equity owners. In *Condec*, plaintiff had made a tender offer and received tenders for a controlling percentage of Lunkenheimer's stock. Condec's control over Lunkenheimer was frustrated, however, when Lunkenheimer's management contracted to sell its business to U.S. Industries and, in the context of that agreement, issued 75,000 additional shares of Lunkenheimer stock. The court found "the primary purpose of the [defendant's actions] was to prevent control of Lunkenheimer from passing to Condec," 43 Del.Ch. at 362, 230 A.2d at 775, and allowed Condec to sue, on its own behalf, for cancellation of those 75,000 shares. The court held that Condec need not prove an injury to the corporation as the defendants had argued; that would be necessary only if, for example, a stockholder was attacking, on a derivative basis, the spending of a corporation's funds for the repurchase of its own stock. 43 Del.Ch. at 365–66, 230 A.2d at 777. Instead, the court concluded, a personal action was proper because Condec was "a stockholder with a *contractual right* to voting control being deprived of such control...." *Id.* (emphasis added). *See generally* 13 W. Fletcher, *supra*, at § 5915 (enumeration of claims properly brought on an individual basis).

Appellant's allegations do not fall within the "special injury" exception articulated above. Although Cowin generally argues that appellees—through their conduct—have breached fiduciary duties owed directly to the minority shareholders, he has not shown, and indeed could not show, that these duties are distinct from those owed the corporation. His claims that appellees caused the company to enter into a series of "unfair" transactions that have "involved self-dealing" and "diverting assets" are fundamentally claims belonging to the corporation and to Cowin only derivatively. *See* Complaint ¶¶ 13–14, 35–36, 42, 45; R.E. at 6–7, 13, 14, 15. Cowin's charge that the deceptive and incomplete reports issued by the company in an attempt to "artificially deflate ... the market price of [the company's] common stock" is also an allegation of harm primarily to the corporation shared by each stockholder proportionate to their holdings. Complaint ¶ 48; R.E. at 16. While the underlying value of the corporation's assets may be unaffected by this wrongful act, the attractiveness of the corporation as an investment and its ability to compete for capital funds have been impaired. That these deceptive reports may have prevented the company stock from being traded in a "perfect" market causes similar injury to the corporation. In these circumstances, then, because "each [shareholder] will be made whole if the corporation obtains compensation or restitution from the wrongdoer," *Empire Life*, 468 F.2d at 335, appellant must pursue his common law claims for damages and injunctive relief on a derivative basis. *See also Bokat v. Getty Oil Co.*, 262 A.2d at 249.[7]

**7.** The cases upon which appellant relies are not to the contrary. *Mayflower Hotel Stockholders Protective Comm. v. Mayflower Hotel Corp.*, 173 F.2d 416 (D.C.Cir.1949), was a shareholder's derivative action brought under District of Columbia law; the case did not involve the question before us today. *Mayflower Hotel* merely recognizes that the directors of a corporation owe a fiduciary duty to the minority shareholders of the company—and nothing in our opinion minimizes that obligation.

In *Tankersley v. Albright*, 80 F.R.D. 441 (N.D. Ill.1978), the court dismissed claims similar to those raised by appellant because they were not brought derivatively. *Id.* at 444–45. The court did allow certain claims to proceed on an individual basis. Those claims, however—the failure to declare dividends, the failure to register the stock with the SEC, and certain claims brought against the defendants, not in their capacity as directors of the corporation but as trustees of a voting trust—are properly pursued

### B.

Cowin's request for the appointment of a receiver to liquidate the company, as distinct from his state law claims for damages and injunctive relief, was properly before the district court in a personal action. *See, e.g., Lichens Co. v. Standard Commercial Tobacco Co.*, 28 Del.Ch. 220, 228–32, 40 A.2d 447, 451–52 (1944); *Salnita Corp. v. Walter Holding Corp.*, 19 Del.Ch. 426, 431, 168. A. 74, 76 (1933). The court found, however, that Cowin had failed to meet the pleading requirements necessary to support such relief. R.E. at 33. We disagree. Although a request for a court-appointed receiver "to wind up a solvent going business is rarely granted," *Berwald v. Mission Development Co.*, 40 Del.Ch. 509, 512, 185 A.2d 480, 482 (Sup.Ct.1962), and the court's power to do so must "always [be] exercised with great restraint," *Hall v. John S. Isaacs & Sons Farms, Inc.*, 39 Del.Ch. 244, 253, 163 A.2d 288, 293 (Sup.Ct. 1960), we believe that Cowin has sufficiently plead the requisite elements to support his claim.[8]

■ To establish the claim for a court-appointed receiver, Cowin must allege facts to show that the majority shareholders or directors of the company have engaged in, or are presently engaged in, fraudulent misconduct which puts the company at immediate risk of great loss. In *Warshaw v. Calhoun*, 43 Del.Ch. 148, 221 A.2d 487 (Sup.Ct.1966), the Delaware Supreme Court stated:

It is plain, we think, that for a court to order a dissolution or liquidation of a solvent corporation, the proponents must show a failure of corporate purpose, a fraudulent disregard of the minority's rights, or some other facts which indicates *an imminent danger of great loss resulting from fraudulent or absolute mismanagement.*

43 Del.Ch. at 155, 221 A.2d at 491 (emphasis added). Where imminent risk of great loss is not present, or, where no illegal or fraudulent acts have occurred, a "receiver may not be appointed to liquidate [the company]." 43 Del.Ch. at 156, 221 A.2d at 491. Moreover, mere apprehension of future misconduct based upon prior mismanagement will not satisfy the "imminent danger" requirement. *Campbell v. Pennsylvania Industries, Inc.*, 99 F.Supp. 199, 206 (D.Del.1951). A shareholder's exclusive remedy, when his complaint is not based on any illegality, is to withdraw from the corporate enterprise. *Id.*[9]

Case law also appears to require Cowin to allege facts showing that a court-ap-

---

in an individual action for the reasons identified in the text, *supra* at 414–416.

Finally, as our discussion in the text shows, *Empire Life* and *Sedco International* do not stand for the proposition—urged by Cowin—that a shareholder injured due to fraud or misrepresentation by the directors of the company may sue as an individual even where the challenged conduct has "wronged the corporation as well...." Brief for Plaintiff-Appellant at 40. *Johnson v. American Gen. Ins. Co.*, 296 F.Supp. 802 (D.D.C.1969), is misread by appellant in a similar fashion.

**8.** The district court initially ruled that "a federal court possesses the inherent power to apply federal law when it is requested to appoint a receiver ... to liquidate a solvent corporation." R.E. at 32. *Accord Campbell v. Pennsylvania Industries, Inc.*, 99 F.Supp. 199, 204 (D.Del.1951) ("In granting ... [a court-appointed receiver] the federal court looks to federal law ... to determine the principles which are to be applied."). *Cf. Bellevue Gardens, Inc. v. Hill*, 297 F.2d 185, 187 (D.C.Cir.1961). We are not as

sure that federal law is properly applied. In our view, the propriety—in a diversity suit—of appointing a receiver to liquidate a business organized under state law sounds a substantive right that should be determined by reference to state law. *See Ashley v. Keith Oil Co.*, 73 F.Supp. 37, 55 (D.Mass.1947); 16 W. Fletcher, *Cyclopedia on the Law of Corporations*, § 7743 (Perm. ed. 1980). However, as it appears that federal standards on this question are the same as those of Delaware, *see Pennsylvania Industries*, 99 F.Supp. at 204–05; E. Folk, *The Delaware General Corporation Law* § 226 (1972), we leave the resolution of this question for another day. On remand, the district court is of course free to pursue this question further if there is any need to do so.

**9.** We do not believe, as the district court seemed to assume, R.E. at 3–4. n. * that "imminent risk" can be demonstrated only if the fraudulent acts are being perpetrated on an ongoing basis; past acts as well, whose effects are of a continuing nature, may lead the corporation to "imminent risk."

pointed receiver—a particularly onerous form of relief—is the only relief that will remedy appellees' misdeeds. In *Lichens Co.*, for example, the court stated that the "inherent power of a court of equity to appoint a receiver for a solvent corporation ... must be exercised with great caution, and only where there is real imminent danger of material loss that cannot otherwise be prevented." 28 Del.Ch. at 231, 40 A.2d at 452. *See also Vale v. Atlantic Coast & Inland Corp.*, 34 Del.Ch. 50, 57, 99 A.2d 396, 400 (1953) (to state a claim for the appointment of a receiver, plaintiff "must show fraud, gross mismanagement, or extreme circumstances causing imminent danger of great loss which cannot be otherwise prevented"); *Pennsylvania Industries*, 99 F.Supp. at 207 (same).[10]

■ Bearing in mind the appropriate standard of review at this early stage of the litigation, *see supra* note 3, we think Cowin's allegations establish the elements necessary to support his claim for a court-appointed receiver. His complaint details a series of financial misdealings which, if proven, constitute affirmative acts of misconduct by the directors and majority shareholders in breach of the fiduciary duties owed by them to the corporation and, derivatively, to the minority shareholders. This is not a case, then, like *Warshaw*, where the complainant could only show that the defendant-directors had organized the corporation in such a way that "prevent[ed] it from taking advantage of opportunities that c[a]me its way." 43 Del.Ch. at 155, 221 A.2d at 491. In those circumstances, the court had no power to appoint a receiver because the choice of corporate form, while "unfortunate [wa]s not illegal." *Id.*

Cowin's complaint also alleges that appellees' conduct—both in the past and present—is depriving the corporation of

millions of dollars on an ongoing basis. Complaint ¶¶ 14–16, 22–27, 28–32, 34–39, 42, 45–46; R.E. at 7–8, 9–11, 11–12, 13–14, 15, 16. At this preliminary stage in the pleadings, these allegations are more than sufficient to show the "imminent danger of great loss" necessary to support Cowin's request to put the company into receivership. That the company has suffered net income losses in only one year does not support the district court's dismissal. Likewise, the mere fact that Bresler & Reiner stock was selling, when the complaint was filed, at $4.00 per share (up from a range of $.75 to $2.25 in 1977), does not render incredible the extensive and detailed allegations in Cowin's complaint, nor does it negate the inferences we must draw on a Rule 12(b)(6) motion. The district court impermissibly narrowed the scope of Cowin's complaint by accepting these facts as controlling in the face of Cowin's detailed allegations concerning appellees' misuse of the corporate venture.

Finally, the allegations of Cowin's complaint are sufficient to raise the question whether any relief short of receivership will remedy appellees' past wrongs or deter them from further transgressions. It is undisputed that appellees beneficially control the vast majority of company stock and would retain control of the enterprise even if a shareholder's derivative suit brought the company some measure of relief from appellees' conduct. A derivative action, in these circumstances, might provide only stopgap relief. *See Ashley v. Keith Oil Corp.*, 73 F.Supp. 37,57 (D.Mass.1947); *see also Leibert v. Clapp*, 13 N.Y.2d 313, 247 N.Y.S.2d 102, 196 N.E.2d 540 (1963).

Our disposition should not be taken to suggest that we believe Cowin is entitled to put the company into receivership. Such a course, as the authority indicates, is one of "last-resort," and the court's power to ap-

---

**10.** Appellees' objection that a receiver may not be appointed without hearing from the other minority shareholders cannot be raised at this stage of the proceedings; neither can appellees' taking claim be heard now. These are not matters that go to the sufficiency of these pleadings. *See Burnrite Coal Briquette Co. v. Riggs*, 274 U.S.

208, 212, 47 S.Ct. 578, 579, 71 L.Ed. 1002 (1927), *and Tower Hill-Connellsville Coke Co. v. Piedmont Coal Co.*, 64 F.2d 817, 823–24 (4th Cir.), *cert. denied*, 290 U.S. 675, 54 S.Ct. 93, 78 L.Ed. 582 (1933). We do not speak to what notice to the other shareholders might become appropriate at a later stage of these proceedings.

point a receiver to liquidate a solvent business must be exercised rarely and with great restraint. *See Berwald v. Mission Development Co.*, 40 Del.Ch. at 512, 185 A.2d at 482; *Hall v. John S. Isaacs & Sons Farms, Inc.*, 39 Del.Ch. at 253, 163 A.2d at 293. As the foregoing should indicate, however, the ultimate inquiry into the propriety of a receivership is factually complex and does not especially lend itself to resolution solely on the pleadings. We note in this respect that no discovery was permitted in the lower court for two years these motions were pending and that the court, in making its decision, could not consequently take advantage of appellant's ability (or inability) to develop through discovery the factual predicate for his request for a receiver. We believe the district court's analysis failed to accept the full measure of Cowin's fairly detailed pleadings and did not draw the reasonable inferences from those allegations. This portion of Cowin's claim is remanded to the district court for discovery and further factual development.

## II.

Appellant's federal claims raise novel questions under the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* (1982). Although Cowin did not buy or sell his stock in connection with the allegedly misleading reports issued by the company, he relies upon section 10(b) of the Act and Rule 10b–5 in seeking to prevent appellees from "depress[ing] the value of [his] stock and ... eliminat[ing] the public market in that stock through dissemination of deceptive statements." Reply Brief for Plaintiff-Appellant at 18. In short, appellant claims not that he was wrongfully induced to buy or sell stock by appellees' misrepresentations but rather that his stock was made less valuable by appellees' misrepresentations to the investing public generally. He does not seek damages but an injunction requiring an end to the alleged misrepresentations and disclosure of past misrepresentations. It is clear from *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), that appellant could not maintain an action

for damages under section 10(b) or Rule 10b–5. The question before us is whether he may bring suit for an injunction.

Section 10(b) of the 1934 Act prohibits manipulation or deception "in connection with the purchase or sale of any security...." 15 U.S.C. § 78j(b) (1982). The generalized prohibition of fraud in section 10(b) is made more specific by Rule 10b–5, issued by the Securities and Exchange Commission. That rule makes it unlawful for any person:

(1) To employ any device, scheme, or artifice to defraud,

(2) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or

(3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

*in connection with the purchase or sale of any security.*

17 C.F.R. § 240.10b–5 (1983) (emphasis added).

The Act provides no express civil remedy for a violation of section 10(b). Nor did Congress consider the potential for private enforcement when that section was enacted. *Blue Chip*, 421 U.S. at 729, 95 S.Ct. at 1922. Similarly, the Securities and Exchange Commission did not contemplate private suits when adopting Rule 10b–5. The rule was intended to close a "loophole in the protections against fraud administered by the Commission by prohibiting individuals or companies from *buying* securities if they engage in fraud in their purchase." SEC Release No. 3230 (May 21, 1942) (emphasis added), *quoted in Birnbaum v. Newport Steel Corp.*, 193 F.2d 461, 463 (2d Cir.), *cert. denied*, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952). *See also Blue Chip*, 421 U.S. at 766–67, 95 S.Ct. at 1939–40 (Blackmun, J., dissenting). Its only purpose was "to make the ... [anti-fraud] prohibitions contained in Sec-

tion 17(a) of the 1933 Act applicable to purchasers as well as to sellers." *Birnbaum*, 193 F.2d at 463.

Despite the existence of express remedies in the Act, it has long been settled that a private party may sue under section 10(b) and Rule 10b–5. The threat of private suits has become a valuable adjunct to the Securities and Exchange Commission's enforcement powers. However, the fact that a cause of action exists does not mean that any person can invoke section 10(b)'s protections. "We are dealing with a private cause of action which has been judicially found to exist, and which will have to be judicially delimited one way or another unless and until Congress addresses the question." *Blue Chip*, 421 U.S. at 749, 95 S.Ct. at 1931. This case requires us to consider one limitation on the class of potential plaintiffs under Rule 10b–5.

### A.

In *Blue Chip*, the Supreme Court held that only purchasers or sellers of securities have standing to pursue private claims for damages under section 10(b) and Rule 10b–5. The only difference between that case and this is that appellant seeks only injunctive relief. The question is whether that difference means that plaintiff's action survives *Blue Chip*. We think that it does not.[11]

More than twenty years before *Blue Chip*, a distinguished panel of the Second Circuit concluded that section 10(b) was "directed solely at that type of misrepresentation or fraudulent practice usually associated with the sale or purchase of securities rather than at fraudulent mismanagement of corporate affairs...." *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461, 464 (2d Cir.), *cert. denied*, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952).[12] Relying primarily on the purpose underlying the adoption of Rule 10b–5, *Birnbaum* held that the rule extended protection "only to the defrauded purchaser or seller," 193 F.2d at 464, and affirmed dismissal of a complaint that failed to allege that "any of the plaintiffs fell into either class." *Id.* [13]

**11.** Our holding in this regard would also foreclose that portion of Cowin's Rule 10b–5 claim dismissed by the district court "without prejudice." R.E. at 55. We note, however, with respect to appellant's § 10(b) claims that the *Blue Chip* Court noted with apparent approval the fact that a non-selling or purchasing shareholder "who suffered loss in the value of his investment due to corporate or insider activities in connection with the purchase or sale of securities which violate Rule 10b–5 ... may frequently be able to circumvent the [purchaser-seller] limitation through bringing a derivative action on behalf of the corporate issuer if the latter is itself a purchaser or seller of securities." 421 U.S. at 738, 95 S.Ct. at 1926, *citing Schoenbaum v. Firstbrook*, 405 F.2d 215 (2d Cir.1968), *cert. denied*, 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969). *See also Wright v. Heizer Corp.*, 411 F.Supp. 23, 32 (N.D.Ill.1975), *aff'd in part and rev'd in part*, 560 F.2d 236 (7th Cir. 1977), *cert. denied*, 434 U.S. 1066, 98 S.Ct. 1243, 55 L.Ed.2d 767 (1978). On this record, however, we cannot speculate as to the relevance of this possibility.

Cowin also based this portion of his complaint on § 13(a) of the Act, 15 U.S.C. § 78m(a) (1982). The lower court, however, found it unnecessary to decide whether Cowin could maintain his cause of action under § 13(a), R.E. at 33, and appellant did not attempt to support his complaint on appeal by arguing that a private cause of action could be pursued under that section. The court's disposition of the § 13(a) claim in that manner puzzles us in light of the court's dismissal—based on the same factual allegations—of Cowin's Rule 10b–5 and § 10(b) claims. However, absent complete briefing and a lower court opinion on this issue, we decline to reach the question, leaving to the district court, on remand, to explore the matter further. *Cf. Dan River, Inc. v. Unitex Ltd.*, 624 F.2d 1216 (4th Cir.1980), *cert. denied*, 449 U.S. 1101, 101 S.Ct. 896, 66 L.Ed.2d 827 (1981) (court finds implied right of action under § 13(d) of the Act). *But see In re Penn Central Securities Litigation, M.D.L. Docket No. 56*, 494 F.2d 528, 539–40 (3d Cir.1974) (no implied right of action under § 13(a) of the Act).

**12.** The *Birnbaum* court consisted of Chief Judge Swan, and Judges Learned Hand and Augustus N. Hand, with the last writing for a unanimous court, and was described by Justice Blackmun, dissenting in *Blue Chip*, as "a justifiably esteemed panel of that Court of Appeals regarded as the 'Mother Court' in this area of law." 421 U.S. at 762, 95 S.Ct. at 1938 (footnote omitted).

**13.** Though not apparent from the Second Circuit's opinion, *Birnbaum* was a suit in equity seeking rescission of a sale allegedly violative of Rule 10b–5 and an accounting by the defendants. See *Birnbaum v. Newport Steel Corp.*, 98

After declining an earlier opportunity to rule on *Birnbaum*'s standing requirements, *see Superintendent of Insurance v. Bankers Life & Casualty Co.*, 404 U.S. 6, 13–14 n. 10, 92 S.Ct. 165, 169–170 n. 10, 30 L.Ed.2d 128 (1971), the Supreme Court in *Blue Chip* affirmed the vitality of the *Birnbaum* restriction in private damage actions under Rule 10b–5. The plaintiffs in *Blue Chip* were disappointed offerees of a registered stock offering held pursuant to an antitrust consent decree. They sued under section 10(b) and Rule 10b–5 alleging that they had been dissuaded from purchasing the offered shares because of their reliance on a false and misleading prospectus. The district court dismissed the complaint, but the Ninth Circuit reversed. The court of appeals reasoned that plaintiffs' status as offerees pursuant to a court-ordered stock offering was the functional equivalent of having a contract right to purchase securities; since *Birnbaum* had been interpreted not to exclude those possessing contract rights, plaintiff was held to have standing.

The Supreme Court reversed.[14] The Court noted that virtually all courts facing the issue had reaffirmed *Birnbaum*'s limitation on standing and it observed that the SEC had twice sought to extend the reach of section 10(b) by introducing legislation amending the language from "in connection with the purchase or sale of any security" to "in connection with the purchase or sale of, *or any attempt to purchase or sell*, any security." *Blue Chip*, 421 U.S. at 732, 95 S.Ct. at 1924 (emphasis in original). Both attempts were rejected by Congress. *Id.* In light of this "history," the Court stated:

> The longstanding acceptance by the courts, coupled with Congress' failure to reject *Birnbaum*'s reasonable interpretation of the wording of § 10(b), wording which is directed toward injury suffered "in connection with the purchase or sale" of securities, argues significantly in favor of acceptance of the *Birnbaum* rule by this Court.

*Id.* at 733, 95 S.Ct. at 1924 (footnote omitted).[15]

The Court also noted that "[a]vailable evidence from the texts of the 1933 and 1934 Acts ... supports the result reached by the *Birnbaum* court." 421 U.S. at 733, 95 S.Ct. at 1924. For example, Congress specifically extended the scope of section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a) (1982), to reach fraud "in the offer or sale" of securities: this was language (and presumably scope) it avoided in section 10(b). 421 U.S. at 733–34, 95 S.Ct. at 1924–25. The Court stated that "[w]hen Congress wished to provide a remedy to those who neither purchase nor sell securities, it had little trouble in doing so expressly." *Id.* at 734, 95 S.Ct. at 1925. Moreover, the express remedies in the Act, created contemporaneously by Congress with the enactment of section 10(b), are by their terms expressly limited to purchasers or sellers of securities. *Id.* at 736, 95 S.Ct.

---

F.Supp. 506 (S.D.N.Y.1951). The appellate court's decision, moreover, did not appear to turn on the nature of relief sought. Based on this, the Eleventh Circuit recently stated that "[i]f *Birnbaum* were binding on this panel it would mandate ... dismissal of ... [the] section 10(b) claim for injunctive relief." *Liberty Nat'l Ins. Holding Co. v. Charter Co.*, 734 F.2d 545, 557 n. 26 (11th Cir.1984). While it is true that *Birnbaum* was an "action in equity," the nature of relief sought was essentially monetary.

**14.** Justice Rehnquist wrote for the majority, joined by Chief Justice Burger, and Justices White, Stewart, Marshall and Powell. Justice Powell also concurred separately, in an opinion joined by Justices Stewart and Marshall. Justice Blackmun's dissenting opinion was joined by Justices Douglas and Brennan.

**15.** In response to the dissenters' argument that the term "sale" in § 10(b) was intended to include "offers to sell," the Court pointed out that the Act itself defines "sale" and that Congress had deleted from that definition events such as offers and advertisements that might eventually lead to a consummated transaction. 421 U.S. at 733 n. 5, 95 S.Ct. at 1924 n. 5. Continuing, the Court stated: "Beyond this, the wording of § 10(b), making fraud *in connection with the purchase or sale of a security* a violation of the Act, is surely badly strained when construed to provide a cause of action, not to purchasers or sellers of securities, but to the world at large." *Id.* (emphasis in original).

at 1925. *See, e.g.,* Securities Act of 1933, § 11(a), 15 U.S.C. § 77k(a) (1982) (action granted to those "acquiring" a security); *id.* § 12, 15 U.S.C. § 77*l* (1982) (action granted to purchasers); Securities Exchange Act of 1934, § 9(e), 15 U.S.C. § 78i(e) (1982) (action granted to purchasers and sellers); *id.* § 18(a), 15 U.S.C. § 78r(a) (1982) (same). Considering the scope of these express remedies, the Court said that:

> [I]t would indeed be anomalous to impute to Congress an intention to expand the plaintiff class for a judicially implied cause of action beyond the bounds it delineated for comparable express causes of action.

421 U.S. at 736, 95 S.Ct. at 1926 (footnote omitted).

Finally, the majority opinion recognized the primary function Rule 10b–5 was intended to serve—the elimination of a loophole permitting the defrauding of sellers—and observed that the extension of Rule 10b–5, under these facts, would extend a remedy for 1933 Act violations to those Congress excluded from the class protected by the express remedies of that Act. 421 U.S. at 736–37 n. 8, 95 S.Ct. at 1925–26 n. 8.

The *Blue Chip* Court, however, did not rest its conclusion "solely on language, history, and precedent." *The Supreme Court, 1974 Term,* 89 Harv.L.Rev. 49, 265 (1975). *See also Liberty National Insurance Holding Co. v. Charter Co.,* 734 F.2d 545, 556 (11th Cir.1984); *Northland Capital Corp. v. Silver,* 735 F.2d 1421 (D.C.Cir. 1984). The Court stated:

> [W]e would by no means be understood as suggesting that we are able to divine from the language of § 10(b) the express "intent of Congress" as to the contours of a private cause of action under Rule 10b–5. When we deal with private actions under Rule 10b–5, we deal with a judicial oak which has grown from little more than a legislative acorn.

421 U.S. at 737, 95 S.Ct. at 1926. The Court thus deemed it proper to examine several "policy considerations" implicated

by its decision affirming the *Birnbaum* rule. *Id.*

The Court first identified three classes of potential plaintiffs precluded from suing under *Birnbaum* and recognized that the rule "prevents some deserving plaintiffs from recovering damages which have in fact been caused by violations of Rule 10b–5." 421 U.S. at 737–38, 95 S.Ct. at 1926–27. Nonetheless, other factors outweighed this disadvantage. The Court argued that Rule 10b–5 litigation presents "a danger of vexatiousness different in degree and in kind from that which accompanies litigation in general." *Id.* at 739, 95 S.Ct. at 1927. Given the settlement value of most Rule 10b–5 claims, expansion of the plaintiff class would thus increase the potential and incidence of "nuisance" or "strike" suits. Similarly, the "potential for possible abuse of ... liberal discovery provisions" would provide "an *in terrorem* increment of the settlement value" in these cases. *Id.* at 741, 95 S.Ct. at 1928. To expand the plaintiff class under Rule 10b–5 "would [thus] appear to encourage the least appealing aspect of the use of the discovery rules." *Id.*

The Court was also concerned with the problems of proof that would necessarily inhere in expansion of the plaintiff class to include those claiming injury based solely on an allegation that the defendant's conduct caused them *not* to do something. A plaintiff who neither buys nor sells seeks "a largely conjectural and speculative recovery in which the number of shares involved will depend on the plaintiff's subjective hypothesis." 421 U.S. at 734–35, 95 S.Ct. at 1925. Moreover,

> [p]laintiff's entire testimony could be dependent upon uncorroborated oral evidence of many of the crucial elements of his claim, and still be sufficient to go to the jury. The jury would not even have the benefit of weighing the plaintiff's version against the defendant's version, since the elements to which the plaintiff would testify would be in many cases totally unknown and unknowable to the defendant. The very real risk in permitting those in respondent's position to sue

under Rule 10b–5 is that the door will be open to recovery of substantial damages on the part of one who offers only his own testimony to prove that he ever consulted a prospectus of the issuer, that he paid any attention to it, or that the representations contained in it damaged him.

*Id.* at 746, 95 S.Ct. at 1930 (footnote omitted).

In the final section of its opinion, the Court rejected an invitation to create, on the facts of the case, an exception to the *Birnbaum* rule. That plaintiff was a member of a discrete and limited class and that, as such, the "practical difficulties of corroborating at least some elements of [its] proof" were thereby mitigated was not sufficient to bypass the purchaser-seller limitation. 421 U.S. at 754–55, 95 S.Ct. at 1934–35. *Birnbaum* was not "merely a shorthand judgment on the nature of a particular plaintiff's proof." *Id.* at 754, 95 S.Ct. at 1934. Thus, even though plaintiff had a "prior connection" with the defendants and was "intended to benefit from ... the consent decree," the Court dismissed its claims:

> But respondent and the members of its class are neither "purchasers" nor "sellers," as those terms are defined in the 1934 Act, and therefore to the extent that their claim of standing to sue were recognized, it would mean that the lesser practical difficulties of corroborating at least some elements of their proof would be regarded as sufficient to avoid the *Birnbaum* rule. While we have noted that these practical difficulties, particularly in the case of a complete stranger to the corporation, support the retention

of that rule, they are by no means the only factor which does so. The general adoption of the rule by other federal courts in the 25 years since it was announced, and the consistency of the rule with the statutes involved and their legislative history, are likewise bases for retaining the rule. Were we to agree with the Court of Appeals in this case, we would leave the *Birnbaum* rule open to endless case-by-case erosion depending on whether a particular group of plaintiffs was thought by the court in which the issue was being litigated to be sufficiently more discrete than the world of potential purchasers at large to justify an exception.

*Id.* at 754–55, 95 S.Ct. at 1934–35.[16]

### B.

Cowin argues that the purchaser-seller limitation does not apply to actions seeking equitable relief. He points to a pre-*Blue Chip* line of cases holding that a private party who seeks only injunctive relief need not have bought or sold securities to sue under Rule 10b–5, *see, e.g., Kahan v. Rosenstiel*, 424 F.2d 161 (3d Cir.), *cert. denied*, 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290 (1970); *Mutual Shares Corp. v. Genesco, Inc.*, 384 F.2d 540 (2d Cir.1967), and contends that the "exception" to the purchaser-seller rule in those cases survives *Blue Chip* because the Supreme Court limited its holding in that case to private damage actions. Brief for Plaintiff-Appellant at 19–24. We appear to be the first court of appeals squarely to address this issue,[17] and we think *Blue Chip* cannot be so limited.

**16.** Justice Powell's concurring opinion rests on the express language of § 10(b) and Rule 10b–5. 421 U.S. at 755–61, 95 S.Ct. at 1934–37. According to that opinion, the "critical phrase" in both the statute and the Rule is "in connection with the *purchase* or *sale* of any security." *Id.* at 756, 95 S.Ct. at 1935 (emphasis in original). Respondent's argument required the Court to read that language as though it stated "in connection with the purchase or sale of, or *an offer to sell,* any security." *Id.* (emphasis added). Justice Powell said the Court could not do this absent "unmistakable support in the history and structure of the legislation." There being no such support,

the class of potential plaintiffs under § 10(b) is properly limited to purchasers or sellers.

**17.** The Eleventh Circuit recently discussed a related issue in *Liberty Nat'l Ins. Holding Co. v. Charter Co.*, 734 F.2d 545 (1984). There the court held that the shareholder plaintiffs did not have a private cause of action under § 10(b) to force the controlling shareholder to divest itself of its holdings, or to remove voting power from the controlling shareholder. At 558–59. In *Tully v. Mott Supermarkets, Inc.*, 540 F.2d 187 (3d Cir.1976), the court assumed for "present purposes" only, that the "relaxed standing rule of

It is true, as the Court in *Blue Chip* acknowledged, that the question of what constitutes the proper plaintiff class under section 10(b) and Rule 10b–5 cannot be *conclusively* determined by resort to the text of those enactments; as one might expect, neither the statute nor the rule speaks directly to the question of who may sue since the right to sue was created afterwards by the judiciary. *See Blue Chip*, 421 U.S. at 737, 95 S.Ct. at 1926. Still, in the process of implying private rights judges must take account of the statutory scheme. *See generally* Schneider, *Implying Private Rights and Remedies Under the Federal Securities Acts*, 62 N.C.L.Rev. 853, 884–96 (1984); Frankel, *Implied Rights of Action*, 67 Va.L.Rev. 553, 559–70 (1981). No better guidance exists than the language of the relevant statute and regulation. *See Blue Chip*, 421 U.S. at 756, 95 S.Ct. at 1935 (Powell, J., concurring) ("The starting point in every case involving construction of a statute is the language itself.").

■ The relaxed standing requirement urged on us by appellant would be contrary to the rationale of section 10(b) and Rule 10b–5 as perceived by the Supreme Court in *Blue Chip*. While it may be possible to discern differences between an action for damages and a suit for an injunction, most of the Supreme Court's argument in *Blue Chip* applies quite as much to the latter as to the former. The scope of section 10(b) and Rule 10b–5 is limited to fraud "in connection with the purchase or sale of a security." Congress was asked on two different occasions to expand the jurisdictional reach of those provisions but chose not to. In contrast, Congress did choose to define the scope of other provisions in the 1933 and 1934 Acts in terms that clearly reflected a broader jurisdictional reach. Congress also limited standing in those instances where it did create express remedies under the Act to a class of persons including only purchasers or sellers. Thus, the purchaser-seller limitation is "suffi-

ciently supported by the statutory structure of the Securities Act." *The Supreme Court, 1974 Term, supra*, 89 Harv.L.Rev. at 269. *See also Northland Capital Corp.*, at 1426–27 (*Blue Chip*'s holding based primarily on the "language of the Act and its legislative history"). These features also constrain us to accept, in the context of an injunctive suit, the common meaning of the terms "purchase or sale" and reject an expansive construction of the Rule, as *Blue Chip* did for damage actions.

Attempting to fashion a different concept of standing for cases like this would involve us in distinctions altogether too awkward to be persuasive. As *Blue Chip* noted, the "wording of § 10(b) ... is surely badly strained when construed to provide a cause of action, not to purchasers and sellers of securities, but to the world at large." 421 U.S. at 733 n. 5, 95 S.Ct. at 1924 n. 5. The Court also stated that it "would indeed be anomalous to impute to Congress an intention to expand the plaintiff class for a judicially implied cause of action beyond the bounds it delineated for comparable express causes of action." *Id.* at 737, 95 S.Ct. at 1926. *See also id.* at 755, 95 S.Ct. at 1934 (noting "consistency of [*Birnbaum*] rule with the statutes involved and their legislative history").

Our analysis might well end here. However, because *Blue Chip* went beyond statutory analysis to examine certain "policy considerations," 421 U.S. at 737, 95 S.Ct. at 1926. Cowin argues that relaxing the purchaser-seller requirement in his case is proper because that would not contradict the several policies relied upon by *Blue Chip*. Several lower courts, including the lower court in this case, have distinguished the Supreme Court's opinion in this fashion. *See, e.g., Fuchs v. Swanton Corp.*, 482 F.Supp. 83, 89–90 (S.D.N.Y.1979); *Hundahl v. United Benefit Life Insurance Co.*, 465 F.Supp. 1349, 1357–59 (N.D. Tex.1979).

If we thought this question open, we might conclude that injunctive suits

*Kahan* retains its validity after *Blue Chip Stamps* in appropriate cases where only injunctive relief is sought to prevent incipient 10b–5 violations" but then held that the case before it did not fit into the "*Kahan* exception." *Id.* at 194. In *Davis v. Davis*, 526 F.2d 1286 (5th Cir.1976), the court, in dicta, did approve the "approach taken by the Second Circuit [in *Mutual Shares Corp. v. Genesco*] with regard to in-

junctive relief" but only after it had ruled that the plaintiff was "clearly a 'seller' under the [ ] definitional provisions of the Act." *Id.* at 1289–90.

The only other appellate court to reach this issue directly was a pre-*Blue Chip* case from the Eighth Circuit which adopted the view we take in this case. *See Greater Iowa Corp. v. McLendon*, 378 F.2d 783, 791 (8th Cir.1967).

present many of the same problems of vexatiousness, "strike" suits, abuse of discovery, and the like that damage actions do. We need not decide that, however, for we think the approach appellant suggests is foreclosed by *Blue Chip* itself. There, the plaintiff had contended that two policies articulated by the Court—the difficulties in corroborating the elements of Rule 10b–5 proof and the potential for an unlimited class of plaintiffs—were simply not raised on the facts of the case. If plaintiffs were allowed to sue, the Court said, "it would mean that the lesser practical difficulties of corroborating at least some elements of their proof would be regarded as sufficient to avoid the *Birnbaum* rule." 421 U.S. at 754–55, 95 S.Ct. at 1934–35. The Court rejected this result stating that while its decision to affirm *Birnbaum* was in part based on these "practical difficulties," the consistency of the rule with "the statutes involved and their legislative history [were] likewise bases for retaining the rule." *Id.* at 755, 95 S.Ct. at 1934. To take such arguments into account "would leave the *Birnbaum* rule open to endless case-by-case erosion." *Id.* Thus, while "policy considerations" did play a role in the *Blue Chip* decision, when those policy considerations were inconsistent with the retention of a flat rule and with the other grounds on which the decision rested—the statute and its history—they were not strong enough to create an exception.

In cases of doubt, the institutional role of the Supreme Court weighs in favor of considering its rulings to be general rather than limited to the particular facts. The Supreme Court, unlike the lower federal courts, is given a largely discretionary jurisdiction which is used when areas of the law require clarification. As Judge Marshall put it in holding that *Blue Chip* forecloses injunctive suits by plaintiffs who have neither purchased nor sold securities, "[W]e must be mindful of the [Supreme] Court's function in hearing and deciding ... cases. It does not sit to adjudicate individual disputes; that is the business of the district courts and courts of

appeal. Rather it uses individual cases and controversies to shape and guide the development of the law. This is particularly true where, as here, it speaks in an area of judge made law." *Wright v. Heizer Corp.*, 411 F.Supp. 23, 34 (N.D.Ill.1975), *aff'd in part and rev'd in part,* 560 F.2d 236 (7th Cir.1977), *cert. denied,* 434 U.S. 1066, 98 S.Ct. 1243, 55 L.Ed.2d 767 (1978). When the Court wishes to make a narrow, fact-bound holding, typically it says so. When it does not say so, the rebuttable presumption is that a general rule has been enunciated. Here there is more than that presumption, for the Court gave every indication that it wished to speak broadly. *Blue Chip* expressly acknowledged that the rule it adopted in that case operated as a bar to Rule 10b–5 actions brought by "shareholders, creditors, and perhaps others related to an issuer who suffered loss in the value of their investment due to corporate or insider activities in connection with the purchase or sale of securities which violate Rule 10b–5." 421 U.S. at 737–38, 95 S.Ct. at 1926–27. Appellant falls directly within this group and we may not allow him to proceed on his Rule 10b–5 claims against the company.

## III.

Finally, Cowin's complaint alleges that the appellees have caused the company to issue material misleading proxy statements in the years 1974 through 1979 in violation of section 14(a) of the 1934 Act, 15 U.S.C. § 78n(a) (1982), and Rule 14a–9, 17 C.F.R. § 240.14a–9 (1983). He claims these statements artificially depressed the value of company stock by limiting the public trading market in those shares and resulted in the election of appellees as directors, thus allowing them to continue their fraudulent activities. To remedy these violations of the proxy rules, Cowin sought to have declared void the "elections of defendant directors." Reply Brief for Plaintiff-Appellant at 28.[18]

The district court held that Cowin could not, under section 14(a), challenge "proxy solicitations upon which he has not relied."

---

**18.** Appellees address this claim as though Cowin sought only to void the 1980 directors' elections. *See* Brief for Defendants-Appellees at 37. However, Cowin claims that the complaint alleges "that defendants are continuing to issue deceptive proxy statements" and that the relief he requests is not limited only to a declaration that

the 1980 election is void. Reply Brief for Plaintiff-Appellant at 28. While the complaint is hardly a model of clarity on this point, we agree that it can, and should, be read in this fashion. Appellees' "mootness" argument, see Brief for Defendants-Appellees at 37, is thus rejected.

R.E. at 51. The court agreed with a recent Ninth Circuit decision that ruled "the policies of § 14(a) and established doctrine in analogous securities contexts supports the ... position [that] shareholders who do not rely on allegedly misleading or deceptive proxy solicitations lack standing to assert direct (as opposed to derivative) equitable actions under § 14(a)." R.E. at 52 (quoting *Gaines v. Haughton,* 645 F.2d 761, 774 (9th Cir.1981), *cert. denied,* 454 U.S. 1145, 102 S.Ct. 1006, 71 L.Ed.2d 297 (1982)). In response to a line of cases—relied on by Cowin—taking the contrary position, the court stated that because those cases "so preceded the Supreme Court's recent restrictions on private securities actions ... their precedential value is dubious." R.E. at 52. On appeal, appellees rely primarily on the district court's opinion. Cowin again points to those cases holding that standing to raise section 14(a) claims does not require reliance on the allegedly deceptive proxy materials and argues that the contrary position "conflicts with the remedial purpose of Section 14(a), is unsound in logic, and is contrary to the weight of authority." Brief for Plaintiff-Appellant at 46.

█ Our examination of who may sue under section 14(a) follows the approach taken in part II B *supra* to analyze Cowin's section 10(b) claims. Regarding section 14(a), however, we find no language in the relevant statutory materials that leads us to conclude that reliance is a prerequisite to standing under that section. Nor is there any Supreme Court decision that directly controls our resolution of the question. The analysis in *Blue Chip*—heavily influenced by the statutory text—in fact supports our conclusion that Cowin does not need to show reliance to bring a section 14(a) claim.[19]

In *J.I. Case Co. v. Borak,* 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964), the Supreme Court found an implied private remedy in section 14(a) because private enforcement served that statute's purpose— "to prevent management ... from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitation"—and was "a necessary supplement to Commission action." *Id.* at 431–32, 84 S.Ct. at 1559–60. While subsequent private right cases suggest a shift in analytical focus, *see, e.g., Touche Ross & Co. v. Redington,* 442 U.S. 560, 577, 99 S.Ct. 2479, 2489, 61 L.Ed.2d 82 (1979),[20] the Supreme Court has never restricted the class of potential plaintiffs under section 14(a) as it has done under section 10(b) and Rule 10b–5.[21] In fact, the *Blue Chip* opinion stated that the implication of a private remedy under section 10(b) was "entirely consistent with the Court's recognition in ... *Borak* ... that private enforcement of Commission rules may '[provide] a necessary supplement to Commission action.'" 421 U.S. at 730, 95 S.Ct. at 1923.

Both section 14(a) and Rule 14a–9 proscribe in clear terms a specific form of misconduct. Section 14(a) makes it unlawful to solicit proxies "in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors...." 15 U.S.C. § 78n(a) (1982). Rule 14a–9 expressly prohibits false or misleading proxy solicitations:

> No solicitation subject to this regulation shall be made by means of any proxy statement ... which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or

**19.** To the extent appellees argue that Cowin's § 14(a) claims—based primarily on self-dealing transactions in violation of the common law— are barred by *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), we think the district court is the proper forum for the initial determination of this question. While the district court apparently alludes to this argument, R.E. at 40–41, the opinion on this point is undeveloped. In this regard, however, we again note our discomfort with the district court's dismissal of most of Cowin's claims without permitting any discovery on any of the issues.

**20.** One commentator has suggested that the analysis of *Borak* retains validity today. Schneider, *supra,* 62 N.C.L.Rev. at 897.

**21.** Perhaps one reason the "delimit[ation]," *Blue Chip,* 421 U.S. at 749, 95 S.Ct. at 1931, has not been deemed necessary with respect to § 14(a) is that the conduct proscribed in the statute—deceptive proxy solicitations—is itself a means by which the plaintiff class is defined and restricted.

which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

17 C.F.R. § 240.14a–9 (1983). Unlike section 10(b) and Rule 10b–5, neither section 14(a) nor Rule 14a–9 prohibits the unlawful conduct in connection with a particular activity; deceptive proxy solicitations are unconditionally proscribed. It cannot be said then that the language of the statute and the regulation constrains us to find reliance a necessary predicate to standing under section 14(a). *Cf. Blue Chip,* 421 U.S. at 749, 95 S.Ct. at 1931. Indeed, there is much to suggest the contrary conclusion.[22]

The Act demands full and fair disclosure. Section 14(a) was enacted to prevent "management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitations." *Borak,* 377 U.S. at 431, 84 S.Ct. at 1559. *See also T.S.C. Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 448, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). Congress sought to "ensur[e] that proxies would be solicited with 'explanation to the stockholders of the real nature of the questions for which authority to cast his vote is sought.'" *Mills v. Electric Auto-lite Co.,* 396 U.S. 375, 381, 90 S.Ct. 616, 620, 24 L.Ed.2d 593 (1970) (quoting H.R.Rep. No. 1383, 73d Cong., 2d Sess. 14 (1934)). The goal of Congress thus seems to have been to protect a shareholder's investment from self-serving designs of those at odds with the best interest of the corporation. *See, e.g.,* S.Rep. No. 1455, 73d Cong., 2d Sess. 77 (1934) (section 14(a) intended to protect investors from "promiscuous" proxy solicitations by "unscrupulous corporate officials seeking to retain control of the management by concealing and distorting facts"). *Borak* itself identifies the injury section 14(a) sought to prevent:

The injury which a stockholder suffers from corporate action pursuant to a deceptive proxy solicitation ordinarily flows from the damage done the corporation, rather than from the damage inflicted directly upon the stockholder. The damage suffered results not from the deceit practiced on him alone but rather from the deceit practiced on the stockholders as a group.

377 U.S. at 432, 84 S.Ct. at 1560.

The injury Cowin alleges was not caused by his individual reliance on deceptive proxy solicitations. Rather, his claim is that other shareholders elected appellees as directors because they were misled by the proxy materials. The installation of appellees as directors and their subsequent actions has injured appellant. This injury is totally divorced from any reliance, or lack of reliance, on Cowin's part and falls precisely into the scope of injury Congress sought to protect. *Borak,* 377 U.S. at 432, 84 S.Ct. at 1559. Requiring reliance in these circumstances would serve no legitimate policy and we decline to do so. *See Hershfang v. Knotter,* 562 F.Supp. 393, 397–98 (E.D.Va.1983), *aff'd mem.,* 725 F.2d 675 (4th Cir.1984) (plaintiff has standing under section 14(a) despite his lack of reliance because injury suffered has no connection to his individual reliance). *Jones v. National Distillers & Chemical Corp.,* 484 F.Supp. 679, 684–85 (S.D.N.Y.1979) (same). *Cf. Ash v. GAF Corp.,* 723 F.2d 1090, 1094–95 (3d Cir.1983) (where plaintiff's claimed injury was a violation of Rule 14a–3—requiring proxy statements to be "accompanied or preceded" by annual reports—fact that he did not vote or attempt to exercise his proxy precluded him from suing to invalidate a director's election).

We think sentiment expressed in a recent district court opinion persuasive.

It is abundantly clear that Congress' intent to protect the investing public would be seriously hampered if one who misuses the proxy process cannot be brought to task by those shareholders who have from the outset recognized his deceptions, but has only to fear that the other shareholders whom he has successfully beguiled will belatedly become enlightened and seek redress for the damage he has done them.

*Lynch v. Fulks,* [1981 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 97,831, at 90,134 (D.Kan. Dec. 12, 1980). *See also Clayton*

---

**22.** Like the Court in *Blue Chip,* where we must "flesh out the portions of the law with respect to which neither the congressional enactment nor the administrative regulations offer conclusive guidance," it is appropriate for us to take into account various "policy considerations." 421 U.S. at 737, 95 S.Ct. at 1926.

*v. Skelly Oil Co.*, [1977–1978 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,269, at 92,727 (S.D.N.Y. Dec. 30, 1977). Because the controlling statutory materials are silent on the question and because we believe a contrary rule would partially frustrate congressional policy, we find that Cowin need not prove reliance to bring a section 14(a) claim.

The district court, however, had alternative grounds for dismissing the section 14(a) claims. The court found that Cowin had failed to adequately allege an injury that was causally related to the alleged proxy violations. *See* R.E. at 53. Cowin claims that the misleading proxy statement damaged him by causing the market price of his stock to be artificially depressed and by reducing the available resale market for his shares.

■ It may be true that the appellant's alleged injury is capable of being caused by the misleading proxy statement; however, in *J.I. Case Co. v. Borak*, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964), the Supreme Court stated that "[t]he purpose of § 14(a) is to prevent management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitation." *Id.* at 431, 84 S.Ct. at 1559. *See also* S.Rep. No. 1455, 73d Cong., 2d Sess. 77 (1934) (purpose of § 14(a) is to protect shareholders from "unscrupulous" directors and outsiders and to give a full explanation of the proposed authorizations for which shareholders' votes are sought); H.R.Rep. No. 1382, 73d Cong., 2d Sess. 14 (1934) (same). Here the appellant claims his damages are a reduction in the price and market for his shares. This may have occurred due to a misleading proxy statement, but was not a result of a corporate action authorized by the proxy machinery.

In *Mills* the Court recognized that monetary damages may still be allowed where the misleading part of the proxy materials did not relate directly to the transaction involved (in our case the election of directors):

Monetary relief will, of course, also be a possibility. Where the defect in the proxy solicitation relates to the specific terms of the merger, the district court might appropriately order an accounting to ensure that the shareholders receive the value that was represented as coming to them. On the other hand, where,

as here, the misleading aspect of the solicitation did not relate to terms of the merger, monetary relief might be afforded to the shareholders only if the merger resulted in a reduction of the earnings or earnings potential of their holdings. In short, damages should be recoverable only to the extent that they can be shown.

*Mills Auto-Lite Co. v. Electric*, 396 U.S. 375 at 388–89, 90 S.Ct. 616 at 623–24, 24 L.Ed.2d 593. The damages, however, that the *Mills* Court was allowing the plaintiff to show were those that resulted directly from the merger—the authorized corporate action. Allowing claims that have no direct relationship to the purpose of the proxy statement could open the court's doors to suits every time a proxy statement is alleged to have caused the market to react negatively to the stock, regardless of how difficult actual proof of damages would be. The appellant's reliance on *Schlick v. Penn-Dixie Cement Corp.*, 507 F.2d 374 (2d Cir.1974), is likewise misplaced. There the damages alleged flowed directly from the merger authorized by the proxy statement—*i.e.*, an unfair and disadvantageous merger ratio of shares received for those given up. Cowin's damages are not a result of the corporate action authorized by the proxy statement and therefore are not the type of damages sought to be remedied by section 14(a).

■ Cowin also claims that due to the misleading proxy statements the current directors were reelected and he, as a shareholder, was damaged by the continued fraudulent acts of the elected directors. The misconduct alleged here also was not a direct result of the misleading proxy statement and therefore does not meet the causation requirement of *Mills*. 396 U.S. at 385, 90 S.Ct. at 622. See also *Brayton v. Ostrau*, 561 F.Supp. 156 (S.D.N.Y.1983); *Rosenbaum v. Klein*, 547 F.Supp. 586 (E.D.Pa.1982); *Rosengarten v. International Telephone & Telegraph Corp.*, 466 F.Supp. 817 (S.D.N.Y.1979). Appellant is alleging a subsequent breach of fiduciary duty which is only an incident to the election of directors and not actionable under section 14(a). This claim is actionable, if at all, as a state law claim for breach of fiduciary duty.

Because Cowin has not claimed damages that are remediable by a section 14(a) ac-

tion, the district court's dismissal of his claim was proper.

## IV.

We here summarize our disposition of this appeal. We affirm the dismissal of appellant's common law and section 10(b) claims although we affirm the latter on grounds different from those relied upon by the court below. The district court's dismissal of appellant's attempt to put the company into receivership is reversed and remanded for fact-finding. Although it is unnecessary for Cowin to show reliance on the allegedly misleading proxy statements, he has not claimed injury that is remediable by a section 14(a) action. We also affirm the dismissal of Cowin's section 14(a) claims.

*It is so ordered.*